IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| JAMES RICHARD CREWS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 4:12-cv-00009 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ENNIS, INC., | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendant. | ) | |
| | ) | |

On October 29, 2012, Defendant Ennis, Inc. filed a Motion for Summary Judgment ("the Motion") against Plaintiff James R. "Ricky" Crews. [ECF No. 32.] Defendant supported the Motion with affidavits, deposition testimony, and evidentiary support. Plaintiff filed a response and evidence on November 12, 2012. [ECF No. 35.] I heard oral arguments on the Motion on November 20, 2012. The Motion is now ripe for decision and, for the reasons stated below, I will GRANT Defendant's Motion for Summary Judgment and DISMISS this case from the docket of the Court.

## I.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

Defendant Ennis, Inc. ("Defendant") is a Texas-based printed-products manufacturer specializing in business forms and promotional materials. (Kevin Johnston Aff. ¶ 3.) In 1949, Defendant opened a plant in Chatham, Virginia. (Id.) Plaintiff James Richard "Ricky" Crews ("Plaintiff") began working as a press operator at Defendant's Chatham plant in 1972; in 2001, he became a press supervisor. (Debra Brooks Aff. ¶ 4.) He served as the third-shift supervisor for many years until Defendant eliminated the third shift; at that point, he was moved to second-shift supervisor. (James Crews Dep. 17:22−18:2, Aug. 14, 2012.) Kevin Johnston is the general manager of the Chatham plant. (Kevin Johnston Aff. ¶ 2.) In December 2010, Patrick Eimers

joined the Chatham plant as the Production Manager, where he served as Plaintiff's direct supervisor.  (Id. ¶ 6.)  Defendant places great emphasis on the fact that Plaintiff and Eimers did not get along.  (See, e.g., Def.'s Mem. In Support of  Def.'s Mot. for Summ. J. [hereinafter "Def.'s Br."] pg. 3.)  Plaintiff points out that Johnston and Eimers have been friends for twenty-five years.  (See Patrick Eimers Dep. 8:25−9:4, Sept. 27, 2012.)

On or about January 17, 2011, Eimers "instructed [Plaintiff] and an hourly employee to 'move the printing, not as much as a black thick cunt hair, but less than a blonde pussy hair." (Compl. ¶ 13; see also Crews Dep. 58:5−10.)  Plaintiff found the comment unwelcome and disquieting.  (Compl. ¶ 14.)  In its opening brief, Defendant makes only a one-sentence, passing reference to this incident, despite the fact that it is explicitly set forth in the Complaint and is the only comment that Plaintiff heard personally.  (See Def.'s Br. pg. 9.)

On Saturday, January 22, 2011, Plaintiff was working with Press Operator Richard Elliott.  (Richard Elliott Aff. ¶ 4.)  Shortly before the shift began, Eimers instructed Plaintiff to assist Elliott on the press machine.  (Crews Dep. 25:8−11.)  Plaintiff responded that, as a supervisor, he cannot work on Saturdays because "he can't take the hours away from the hourly paid employees" in violation of the union's contract with Defendant.  (Id. 25:12−14.)  Eimers "walked up to [Plaintiff] and stuck his finger right in [Plaintiff's] chest, and he said, 'I want you to press help.  Do you hear me?'  And [Plaintiff] said, 'Yes, sir.'"  (Id. 25:15−17.)

A few days later, Jerome Rigney, a shop steward, informed Elliott that Plaintiff was urging Jerome Rigney to file a grievance with the union because Eimers forced Plaintiff to assist Elliott on the press.  (See Elliott Aff. ¶ 5.)  Elliott informed Johnston about Plaintiff encouraging Rigney to file a grievance.  (Id. ¶ 5; Johnston Aff. ¶ 7.)  Plaintiff disagrees.  He maintains that he did not encourage Elliot or Jerome Rigney to file a grievance.  (James Crews Aff. ¶¶ 5−7.)  In a

supporting affidavit, C.B. Cundiff, a retired Ennis Plant Manager, said that Jerome Rigney, not Plaintiff, encouraged Cundiff to file a grievance with the union over Eimers forcing Plaintiff to work on the floor.  (C.B. Cundiff Aff. ¶ 3.)

On Monday, January 24, 2011, Eimers held a meeting for the production workers. Although Plaintiff was not in attendance, several employees reported Eimers's comments in the meeting to Plaintiff.  (Crews Dep. 38:15−16; 39:13−40:5.)  No females were in attendance at the meeting either.  (Def.'s Br. pg. 5.)  Plaintiff overheard several employees laughing about a "down code" and, when Plaintiff inquired what the employees meant about a "down code," Wayne Meadows told him: "We had a meeting today, and Patrick Eimers told us not to go to the bathroom or unzip our pants and pull our peter out and play with it for 10 minutes and come back in and put a down code for it."  (Crews Dep. 39:24−40:4.)  Kenneth Wallace and Mike Kendrick told Plaintiff the same version of events.  (Id. 40:10-12; 40:24-3.)  Wallace and Kendrick also said that Nancy Rigney, a female employee, "walked in behind Patrick, as he was telling this, and they said they knew she heard some of it."  (Id. 41:3-5.)  Rigney states that, although she was in the general vicinity of the meeting, she heard very little and "do[es] not recall any particular comments that were made by any individuals attending that meeting." (Nancy Rigney Aff. ¶ 4.)

On Friday, January 28, 2011, Nancy Rigney says Plaintiff approached her and told her that she should file a sexual harassment claim against Eimers.  (Id. ¶ 5.)  Plaintiff maintains that he approached Rigney on Tuesday, January 25, and that when he told her what Eimers said, Plaintiff said, "[Eimers] is going to get in trouble for sexual harassment, if he keeps talking like that," and Rigney responded, "You mean I can get some money out of that, if I heard it? . . .  I

never would have to work again." (Crews Dep. 43:10−15.)  Plaintiff denies that he ever told her to file a sexual harassment claim.  (See id. at 42:1−43:17.)

On Friday, January 28, Eimers allegedly yelled at Plaintiff across the Production Room floor.  (Crews. Dep. 53:8−17.)  This event upset and angered Plaintiff.  Defendant takes the position that this event is what prompted Plaintiff to seek out Johnston.  (See Def.'s Br. pg. 7; Crews Dep. 54:21−55:19.)  Plaintiff admits the event was upsetting, but that it was not his reason for complaining to Johnston about Eimers's conduct.  (Crews Dep. 57:7−12.)

Plaintiff met with Johnston on Friday, January 28.  When he told Johnston what Eimers had said in the Production Meeting, Johnston responded, "That's not too bad." (Id. 43:18−44:2.) Plaintiff said, "That's not too bad?  I wonder what corporate would think about it." (Id.) Ultimately, Plaintiff never contacted the Ennis corporate headquarters over the incident.  (See id. 104:12−17.)  When Johnston asked Eimers if he has made the comment about "down codes" at the Production Meeting, Eimers admitted that he had.  (Johnston Dep. 23:16−20.)

On Saturday, January 29, Nancy Rigney approached Eimers and told him to "watch his back because Ricky Crews was trying to get people to make complaints." (Rigney Aff. ¶ 6.)  On Monday, January 31, Debra Brooks, the Human Resources Director, called Nancy Rigney into her office and "wanted to know what Mr. Crews had said to [Rigney] and, then she asked [Rigney] to put it into writing." (Id. ¶ 7.)  Rigney's handwritten statement is attached to her affidavit as Exhibit 1.

On Monday, January 31, Brooks approached Plaintiff and said that Johnston told her that Plaintiff had requested a voluntary layoff.  (Brooks Aff. ¶ 7.)  Plaintiff told her that he had requested one, but had thought about it over the weekend and would be withdrawing his request. (Id. ¶ 7; Crews Dep. 56:21−23.)  Plaintiff says that, at the time, he thought he might need the

voluntary layoff "if [Eimers] keeps this up." (Crews Dep. 56:7−8.)  Again, Defendant argues that the incident where Eimers yelled at Plaintiff in front of the other workers was what "upset the plaintiff the most." (Def.'s Br. pg. 8; Brooks Aff. ¶ 10.)  According to Brooks, Plaintiff informed her that Eimers had told Plaintiff to work the press in violation of the union contract; that he had yelled at him across the Production Room floor; about the comment in the production meeting; and about the pubic hair comment. (See Def.'s Br. pg. 8−9.)  Plaintiff agrees that he told Brooks about the pubic hair comment during this meeting. (See Crews Dep. 57:17−58:24.)

After the meeting, Brooks informed Johnston that Plaintiff was withdrawing his request for voluntary layoff. (Brooks Aff. ¶ 11.)  Johnston indicated that he believed there was information to indicate that Plaintiff was inciting employees to file grievances; he instructed Brooks to meet with Nancy Rigney to determine if that information was true. (Johnston Aff. ¶ 12.)  After confirming with Rigney that Plaintiff had told Rigney to file a claim against Eimers, Johnston instructed Brooks to suspend Plaintiff with pay until he could investigate the matter further. (Johnston Aff. ¶ 13.)  Johnston and Plaintiff scheduled a meeting for Monday, February 7, 2011.

At the February 7 meeting, Plaintiff denied that he encouraged Rigney to file a claim. (Brooks Aff. ¶ 16.)  Plaintiff brought a handwritten letter to the meeting, which outlined Eimers's comments at the Production Meeting and Eimers's pubic hair comment. (Johnston Dep. 21:5−23.)  Nevertheless, Johnston informed Plaintiff that he was being terminated for actions that were detrimental to the Company; to wit, "inciting employees to file a grievance against the Company." (Brooks Aff. ¶ 16.)  In Plaintiff's termination letter, Plaintiff was informed that he was being terminated "for unprofessional conduct based on inappropriate discussions with hourly employees and for failure to follow the appropriate channels in dealing

with Management."  (Brooks Aff. Ex. 3.)   Plaintiff testified that the termination letter was prepared at the time of the meeting and that no member of Defendant's management staff spoke with him regarding his version of events prior to the February 7 meeting.   (Crews Dep. 61:21−23; 65:16−24; <u>see</u> Debra Brooks Dep. 32: 12−18, Sept. 27, 2012.)

On February 21, 2012, Plaintiff filed a single-count complaint against Defendant alleging retaliation in violation of Title VII of the Civil Rights Act of 1964.  (<u>See</u> Compl. ¶¶ 25−36 [ECF No. 1].)  On October 19, 2012, Defendant filed its Motion for Summary Judgment.  [ECF No. 32.]  Plaintiff filed his Brief in Opposition on November 12, 2011.  [ECF No. 35.]  Defendant filed its Reply Brief on November 16, 2012.  [ECF No. 36.]  I heard oral arguments on the Motion on November 20, 2012.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); <u>George & Co. LLC v. Imagination Entm't Ltd.</u>, 575 F.3d 383, 392 (4th Cir. 2009).  A genuine dispute of material fact exists "[w]here the record taken as a whole could . . . lead a rational trier of fact to find for the nonmoving party."  <u>Ricci v. DeStefano</u>, 129 S. Ct. 2658, 2677 (2009) (internal quotation marks and citing reference omitted); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine dispute cannot be found where there is only a scintilla of evidence favoring the nonmovant; rather, a court must look to the quantum of proof applicable to the claim to determine whether a genuine dispute exists.   <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Anderson</u>, 477 U.S. at 249–50, 254.  A fact is material where it might affect the outcome of the case in light of the controlling law.   <u>Anderson</u>, 477 U.S. at 248.  On a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party insofar as there

is a genuine dispute about those facts.  Scott, 550 U.S. at 380.  At this stage, however, a court's role is not to weigh the evidence, but simply to determine whether a genuine dispute exists making it appropriate for the case to proceed to trial.  Anderson, 477 U.S. at 249.  It has been noted that "summary judgment is particularly appropriate . . . [w]here the unresolved issues are primarily legal rather than factual" in nature.  Koehn v. Indian Hills Cmty. Coll., 371 F.3d 394, 396 (8th Cir. 2004).

The movant has the initial burden of pointing out to the court where the deficiency lies in the non-movants's case that would make it impossible for a reasonable fact-finder to bring a verdict in the non-movants's favor.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A moving defendant may show that he is entitled to judgment as a matter of law by demonstrating that the plaintiff could not prove an essential element of his case.  Id. at 322–23.  It is then up to the plaintiff to demonstrate to the court that there are genuine issues of material fact and that he has made a sufficient showing on each of the essential elements of his case.  Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008); Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996).  When the defendant provides affidavits and other materials with his motion for summary judgment, the plaintiff must respond with affidavits, deposition testimony, or as otherwise provided in Fed. R. Civ. P. 56(c).  Celotex Corp., 477 U.S. at 324; Pension Ben. Guar. Corp. v. Beverley, 404 F.3d 243, 246 (4th Cir. 2005).  Mere allegations, denials, references to the complaint, or oral argument is insufficient to rebut a defendant's motion which is supported by affidavits.  Fed. R. Civ. P. 56(e)(2); Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); Beverley, 404 F.3d at 246.  "If the non-moving party has the burden of proof at trial, that party must set forth facts 'sufficient to establish the existence of an element essential to that party's case.'"  Colkitt, 455 F.3d at 201 (quoting Celotrex Corp., 477 U.S. at 322)).

## III.   ANALYSIS

In order to state a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between the employee's protected activity and the employer's adverse employment action.  Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (citing Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004)).  Retaliation cases, like other discrimination cases, may be proven through either direct evidence of retaliation or through the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802−04 (1973).  Once the plaintiff establishes a prima facie case of retaliation, the burden of *production*, not persuasion, shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions.  Once such a reason is shown, the burden shifts back to the plaintiff to show that the offered reason is merely a pretext for discrimination.  See Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

Defendant argues that Plaintiff has failed to make out a prima facie case of retaliation because the comments about which he complained were not "gender based."  Essentially, because Plaintiff only heard a single comment to a room full of men, the comments were not "because of . . . sex."  Courts have drawn a clear line, Defendant says, between juvenile or lewd comments and actionable Title VII harassment.  In Oncale v. Sundowner Offshore Servs., 523 U.S. 75 (1998), the Supreme Court distinguished between harassment that is sexual in content and harassment that is sexually *motivated*:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "[d]iscriminat[ion] . . . because of . . . sex."  We have never held that workplace harassment, even harassment between men and women, is automatically

> discrimination merely because the words were used in sexual
> content or connotations.   "The critical issue, Title VII's text
> indicates, is whether members of one sex are exposed to
> disadvantageous terms or conditions of employment to which
> members of the other sex are not exposed."

Oncale, 523 U.S. at 80 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 25 (1993)).

Defendant maintains that the comments here were not sexually motivated; rather, they were

merely lewd and sexual in content.

Like Defendant, Plaintiff relies on Oncale v. Sundowner Offshore Services, Inc. to

support his position.  In Oncale, the Supreme Court held that male-on-male sexual harassment is

actionable because the critical issue is "whether members of one sex are exposed to

disadvantageous terms or conditions of employment to which members of the other sex are not

exposed." Oncale, 523 U.S. at 80.  "A same-sex harassment plaintiff may . . . offer comparative

evidence about how the alleged harasser treated members of both sexes in a mixed-sex

workplace. . . . [T]he plaintiff . . . must always prove that the conduct at issue was not merely

tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because

of . . . sex.'" Id. at 80−81 (emphasis in original).

Plaintiff maintains that such is the case here.  In the production meeting, no females were

present.   During the closed-door meeting where Eimers made the pubic hair comment to

Plaintiff, Eimers asked Plaintiff if Judy, Eimers's secretary, was present in her office.  Once

Eimers was assured that a female was not within hearing distance, he made the pubic hair

comment to Plaintiff and Elliott.  This is evidence that Eimers's sexual comments are only made

around men, which shows that Eimers treats male employees differently than women.

In a related argument, Defendant cites familiar Fourth Circuit precedent by arguing that

Plaintiff's complaint was not objectively reasonable because the comments were not "severe or

pervasive" enough to constitute harassment under Title VII.  Plaintiff counters by noting that the Supreme Court has emphasized that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale, 523 U.S. at 81 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  One must consider the "social context in which a particular behavior occurs and is experienced by its target." Id.  For example, "[a] professional football player's working environment is not severely or pervasively abusive . . . if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office." Id.  The Court went on to note: "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Id. at 82.

Defendant's first stated grounds for summary judgment—that Plaintiff has failed to prove a prima facie case because the comments were not "gender based"—represents a misunderstanding that is common-place in retaliation cases.  Plaintiff is suing for *retaliation*, not *discrimination*.  A plaintiff may succeed on a retaliation action even if the underlying activity does not rise to the level of discrimination.  See, e.g., Ross v. Comm. Satellite Corp., 759 F. 2d 355, 357 n.1 (4th Cir. 1985) ("An underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation for opposition to perceived discrimination.").  "Although the retaliation claimant does not have to show that the underlying discrimination claim was meritorious to prevail on a related retaliation claim, he must show that he *subjectively* (that is, in good faith) believed that his employer violated [Title VII], and that his belief was

*objectively* reasonable in light of the facts." Johnson v. Mechanics & Farmers Bank, 309 Fed. App'x 675, 685 (4th Cir. 2009) (per curiam) (unpublished).  Moreover, Defendant relies on case law that has no bearing.  For example, Defendant relies on Lack v. Wal-Mart Stores, 240 F.3d 255 (4th Cir. 2001), which concerned the application of the West Virginia Human Rights Act, the state analogue to Title VII.  The plaintiff in Lack, however, was not suing for retaliation; he was suing for discrimination.   Therefore, whether the facts in Lack rose to the level of discrimination has no direct bearing on whether Plaintiff here has stated a prima facie case of retaliation.  Defendant's argument is more properly considered in connection with his second argument—that Plaintiff did not subjectively believe that he was opposing an unlawful employment practice, or that if he did, that belief was not objectively reasonable.

As Defendant properly notes, the Fourth Circuit has added additional requirements to the first prong of the prima facie case.  Generally speaking, complaining about or opposing conduct made unlawful by Title VII is a protected activity.  See, e.g., Harden v. Wicomico Co., Md., 436 Fed. App'x 143, 146 (4th Cir. 2011) (unpublished).  In order for a complaint to be a "protected activity," however, the complainant, who need not be the victim, must subjectively believe that he is complaining about conduct that is unlawful, and that belief must be objectively reasonable. See Jordan v. Alt. Res. Corp., 458 F.3d 332, 338-39 (4th Cir. 2006); EEOC v. Navy Fed. Credit Union, 424 F. 3d 397, 406-07 (4th Cir. 2005); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001) (per curiam) (resolving the objective reasonableness of Title VII plaintiff's beliefs through the summary judgment process, thereby making the issue a question of law).

Taking the facts in the light most favorable to the non-moving party, it is clear that Plaintiff believed he was opposing an unlawful employment practice.  If Plaintiff did not believe the comments represented a hostile work environment, he would have little reason to discuss the

issue with Nancy Rigney and propose that she file a claim of harassment against Eimers.  The only truly disputed question at the summary judgment stage, then, is whether that belief was objectively reasonable.[1]

Defendant states that Plaintiff's complaint was not objectively reasonable because the alleged harassment was not of a severity and character to rise to the level of a Title VII violation. Defendant argues that "[h]arassment is only actionable under Title VII if it is so 'severe or pervasive' that it creates an abusive work environment and alters the conditions of the victim's employment."   (Def.'s Br. pg. 15.)   Considering the nature and limited frequency of the comments, Defendant maintains that, even if Plaintiff did believe he was opposing a hostile work environment, that belief was not objectively reasonable.  See Jennings v. Univ. of N. Carolina at Chapel Hill, 444 F.3d 255, 275 (4th Cir. 2006) (affirming summary judgment in a Title IX case because "no reasonable jury could find that Dorrance's [the female plaintiff's male soccer coach] remarks during Jennings'[s] two-year tenure on the team were sufficiently severe or pervasive to create a sexually hostile educational environment.")[2]

---

[1] In order to state a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between the employee's protected activity and the employer's adverse employment action.  Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (citing Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004)).  Plaintiff has clearly met the second and third prongs. There is no dispute that Plaintiff's termination constituted an adverse employment action.  Likewise, the temporal proximity between Plaintiff's complaint and his suspension and termination strongly suggests Plaintiff was terminated for his actions.  Moreover, Johnston admitted that Plaintiff was terminated because he was inciting employees to file grievances.  (Johnston Dep. 34:17−24.)  Therefore, this Opinion only addresses the disputes concerning prong one—whether Plaintiff's complaint was objectively reasonable, and thus was a protected activity.

[2] Although it explicitly relies on the case, Defendant fails to inform the Court in its pleadings that Jennings was overturned by the Fourth Circuit sitting en banc.  See Jennings v. Univ. of N. Carolina at Chapel Hill, 482 F.3d 686, 691 (4th Cir. 2007) (en banc) ("The district court awarded summary judgment to the defendants. After considering Jennings's appeal en banc, we vacate the summary judgment on her Title IX claim, her § 1983 claim against Dorrance for sexual harassment, and her § 1983 claim against Ehringhaus for sexual harassment based on supervisory liability.").

Plaintiff, understandably, takes issue with Defendant's argument that Plaintiff's belief that he was complaining of a hostile work environment was not objectively reasonable. In Jordan v. Alternative Resources Corp., the Fourth Circuit held that a ***co-worker's*** off-hand racist comment could not reasonably be believed to be indicative of a workplace so permeated with racism that it altered the terms of the plaintiff's employment. Jordan, 458 F.3d at 340. In so holding, the Court rejected Jordan's argument that "'had [Farjah, the co-worker,] continued, unabated, his conduct would at some point have ripened into [a] racially hostile work environment.'" Id. Under the Jordan and E.E.O.C. v. Navy Federal Credit Union holdings, "an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress." Id. at 340−41. Here, Plaintiff maintains that his supervisors' lack of outrage or even response to Eimers's patently offensive statements establish that "one could reasonably conclude that the supervisor condoned the use of [sexually] offensive remarks and would permit them to reoccur." Greene v. MPW Indus. Servs., Inc., Civil Action No. 06-647, 2006 U.S. Dist. LEXIS 72421, at *13 (W.D. Pa. Oct. 4, 2006). Therefore, Plaintiff argues, Jordan does not control. In Greene, the Western District of Pennsylvania distinguished Jordan on the facts.[3] Whereas the comments complained of in Jordan were made by a co-worker, in Greene and in the present case the comments were made by a supervisor and were tacitly condoned by management through its lack of response. See id. Greene's employer made a single reference to "nigger rigging" equipment, see id. at *2−3; Eimers made two sexually explicit statements regarding genitalia to all-male audiences. In both instances, management made no efforts to thwart the comments. Thus, Plaintiff argues, "it

---

[3] The Court's ultimate holding rejected Jordan as a whole, but Chief Judge Ambrose noted that, "even if the Jordan decision were of precedential value here, I would find it to be distinguishable on the facts." Greene, 2006 U.S. Dist. LEXIS 72421, at *13.

would have been objectively reasonable for [Plaintiff] to believe, in light of these facts and circumstances, that he was complaining of a [sexually] hostile work environment." Id. at *13.

Plaintiff's reliance on Greene v. MPW Industries Services, Inc. in order to differentiate the single isolated statement that was insufficient in Jordan from the present facts is not persuasive. In order for Greene to be persuasive, the court applying it would have to agree with and apply the relevant case law. In Greene, Chief Judge Ambrose recognized that, if Jordan were followed, Greene would not have a claim for retaliation. See Greene, 2006 U.S. Dist. LEXIS 72421, at *11 ("I reject the majority's analysis in Jordan and find myself more closely aligned with that offered by the dissent. I believe that the majority's analysis unfairly requires an employee to sit back and wait until harassment has become severe and pervasive before bringing it to the employer's attention."). Therefore, Greene carries only limited persuasive value, as it explicitly rejects the law applicable in this Circuit.

Unlike Jordan—where the plaintiff complained of a single, isolated comment from a co-worker—Plaintiff experienced one exceptionally offensive comment from his supervisor (the pubic hair comment), and was informed about a second one. When the matter was reported to Kevin Johnston, he responded that it "wasn't that bad." (Crews Dep. 43:18–44:2.) It seems clear that Eimers's conduct was going to continue without intervention from management. If that is the case, the question becomes whether it was reasonable for Plaintiff to think his workplace was or would become permeated with sexual comments severe enough to alter the terms and conditions of Plaintiff's employment. See Jordan, 458 F.3d at 339.

Courts determine "whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

- 14 -

unreasonably interferes with an employee's work performance."   Faragher v. City of Boca Raton, 524 U.S. 775, 787−88 (1998) (internal quotations omitted).   Here, the Faragher factors weigh against concluding that the environment was discriminatory.   The conduct consisted of off-color statements; they only occurred twice; the comments were neither threatening nor humiliating to any one individual; and there is no evidence that it interfered with any employee's work performance.   The only factor that weighs in favor of finding discrimination is the severity of the language Eimers used in the pubic hair comment.   Other than that, the comments were nothing but crude, vulgar humor that, while certainly boorish and offensive, did not rise to the level of harassment.   Cf. Oncale, 523 U.S. at 80 ("Title VII does not prohibit all verbal . . . harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.'");.

E.E.O.C. v. Bud Foods, LLC is helpful in this regard.   In that case, the complainant, Sonia Pohoski, alleged that someone high in management said to her:

> "Come here, let's talk about sex"; made an unspecified comment about Pohoski's rear end; told Pohoski, "The last time I had a girl your size, she wore the hair off of my dick"; looked at Pohoski's rear end and said "Mmm, mmm, mmm"; and stated to Pohoski, "I can't fuck you real good because my dick is like this size [indicating with fingers], but I can eat your pussy."

E.E.O.C. v. Bud Foods, LLC, Civil Action No. 5:04CV156, 2006 WL 2265291, at *11 (W.D.N.C. Aug. 7, 2006).   Ultimately, Judge Vorhees granted the defendant's motion for summary judgment, holding that the harassment "does not rise to the level of an actionable hostile work environment claim."   Id.   While Plaintiff need not make out a claim of harassment to sustain a claim of retaliation, two comments unrelated to sex or to an individual could not reasonably be believed to be a hostile work environment.   Because Plaintiff's belief that he was

opposing an unlawful employment practice was not objectively reasonable, then, his claim should fail.

### IV.    CONCLUSION

When Plaintiff complained to his Kevin Johnston about Patrick Eimers's boorish and offensive conducts, he may have thought he was engaging in a protected activity, but that belief was not reasonable.   Based on all the facts, it was not reasonable to believe that the two comments about which he was complaining represented a workplace in the grips of such severe and pervasive sexism as to alter the terms and conditions of the male employees' employment at Ennis, Inc.  Therefore, his claim fails as a matter of law.

The Clerk is directed to forward a copy of this Memorandum Opinion and the attached Order to all counsel of record and to dismiss this case from the docket of the court.

Entered this 27th day of November, 2012.


s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE